# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NRA GROUP, LLC, | : | Civil No. 1:21-CV-00715 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NICOLE DURENLEAU and | : | |
| JAMIE BADACZEWSKI, | : | |
| | : | |
| Defendants/Counterclaim | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| NRA GROUP, LLC, STEVE KUSIC, | : | |
| and SHELL SHARMA | : | |
| | : | |
| Counterclaim Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is a motion for partial summary judgment filed by NRA Group ("NRA") (Plaintiff and counterclaim Defendant), Steve Kusic ("Kusic") and Shell Sharma ("Sharma") (counterclaim Defendants), and a motion for summary judgment filed by Nicole Durenleau ("Durenleau") and Jamie Badaczewski ("Badaczewski") (Defendants and counterclaim Plaintiffs). (Docs. 158, 161.)  In its amended complaint, NRA alleged that Defendants Durenleau and Badaczewski committed violations of the Computer Fraud and Abuse Act ("CFAA"), both the federal and state trade secrets act, breach of common law duty of loyalty, civil conspiracy, and fraud.  (Doc. 8.)  In their amended answers, Durenleau and

1

Badaczewski allege they were subjected to various forms of sex-based harassment under Title VII and the Pennsylvania Human Relations Act ("PHRA").  (Docs. 142, 143.)  In its motion for summary judgment, NRA argues that there are no genuine issues of material fact, and it is entitled to judgment as a matter of law on both the claims it raises in the amended complaint and the counterclaims against it. In their motion for summary judgment, Durenleau and Badaczewski argue there are no genuine issues of material fact, and they are entitled to judgment as a matter of law on NRA's claims against them.  For the reasons that follow, the court will grant Durenleau and Badaczewski's motion for summary judgment, and grant in part and deny in part NRA, Kusic, and Sharma's motion for summary judgment.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

NRA is an "accounts receivable management company."  (Doc. 174, ¶ 1.) Kusic is, and was at all relevant times, the Chief Executive Officer of NRA.  (Doc. 162-8, ¶ 1.)  Sharma is, and was at all relevant times, the Chief Operating Officer of NRA.  (Doc. 174, ¶ 411.)  Durenleau started working at NRA on September 15, 2014, as a collector.  (*Id.* ¶¶ 430–31.)  During her time at NRA, Durenleau was

---

[1] In considering the cross-motions for summary judgment, the court relied on Doc. 174 which includes NRA's statement of material facts (Doc. 161-5) along with Durenleau's and Badaczewski's responses to these facts.  The combined nature of this document made it easier for the court to determine whether and to what extent facts were disputed.  In accordance with the relevant standard for deciding a motion for summary judgment, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

promoted from a collector to client services representative, support services and consumer resolution team lead, assistant manager, compliance manager, and finally, in 2021, she was promoted to senior manager of compliance services. (*Id.* ¶¶ 431–49.) Badaczewski began working for NRA on September 14, 2020, as a marketing employee. (*Id.* ¶¶ 160, 189.)

### A. Facts Relating to Claims Alleged in NRA's Amended Complaint

NRA has multiple layers of security for its computer system, including firewalls, policies against working from home without a company-issued laptop and VPN, multi-factor authentication, and policies against accessing the computer system from personal devices. (*Id.* ¶¶ 6–12.) Further, NRA's security manual prohibits sharing login IDs and passwords or imitating another user. (*Id.* ¶¶ 19, 20.) NRA's security manual also forbids storing passwords "in readable form, in printable or written form or in any location where unauthorized personnel might discover them." (*Id.* ¶ 22.) NRA also has customer privacy policies, Fair Debt Collection Practices Act ("FDCPA") and Health Insurance Portability and Accountability Act ("HIPAA") policies, and workplace policies that prohibit using company computers for personal use. (*Id.* ¶¶ 30–37.) NRA has confidentiality policies, e-mail usage policies, and internet usage policies, which both Defendants acknowledged at the time of their hire. The policies contain possible consequences for violations, including termination. (*Id.* ¶¶ 171–208.)

3

It is undisputed that both Defendants were aware, generally, of all of these policies, due to the signed declarations they executed at the beginning of their employment.  They also admitted multiple times in depositions that they were aware of such policies.  (Doc. 174.)

Durenleau was out of the office from January 4, 2021, through January 13, 2021, on COVID leave.  (*Id.* ¶ 50.)  Durenleau was not given a company computer to access the computer system at home and could only access her company e-mail account through her personal cell phone.  (*Id.* ¶¶ 43, 46.)  Durenleau was denied a laptop and access to the physical office while on COVID leave.  (*Id.* ¶¶ 52, 53.)

On the morning of January 6, 2021, Durenleau's supervisor, Lisa Daube, discovered that there was an issue with one of NRA's state licenses that needed to be resolved that day.  (*Id.* ¶¶ 62, 67.)  The issue required logging in to the National Multistate Licensing System & Registry ("NMLS").  (*Id.* ¶ 71.)  Durenleau controlled portions of NMLS on behalf of NRA.  (*Id.* ¶ 74.)  Daube called Durenleau to ask for her username and password to NMLS.  (*Id*. ¶ 75.)  Durenleau told Daube she did not remember her password.  (*Id.* ¶ 79.)  Through text messages, Daube asked Durenleau "can you resend Steve's [Kusic] access to NMLS?" and also wrote "I can have Doug sift your emails or you can share your log on so we can pay this today."  (*Id.* ¶¶ 93, 94.)

Throughout the morning of January 6, when Durenleau was attempting to assist her superiors in dealing with this issue, she was texting and calling Badaczewski, who was at her office. (*Id.* at ¶¶ 82–95.)  Durenleau provided Badaczewski with her log on information to the NRA computer, Badaczewski logged in as Durenleau from her (Badaczewski's) computer, and Badaczewski accessed a spreadsheet in Durenleau's files containing Durenleau's passwords. (*Id.* ¶¶ 103–106.)  Three minutes after the phone call with Badaczewski, Durenleau relayed her NMLS credentials to Daube.  (*Id.* ¶ 107.)

On the afternoon of January 6, 2021, Kusic sent Durenleau various emails about this issue. At 12:20 pm, Kusic wrote,

> We have a major compliance issue and it needs to be resolved today.  I can not figure out how to use NMLS in a short period of time.  Please let me know how YOU are going to get this fixed by the end of business today.  A reminder this is outstanding since December 16th.

(Doc. 162-1, p. 7.)

At 12:37 pm Durenleau responded, "I went on to NMLS I don't see anywhere to pay anything.  I don't have the papers.  I am not sure what to do from home."  (*Id*. at 8.)  At 12:42 p.m., Kusic responded with the various outstanding documents and also wrote "[t]his is outstanding since December 16th, it must be finalized by the end of business today.  How you do it, is your problem."  (*Id.*)  Less than a minute later, Durenleau responded "[a]ll of these were uploaded on Wednesday." (*Id.* at 9.)  Kusic responded one minute later, "[t]he system says they

are outstanding, as of today.  I am not learning NMLS today, get this License Renewed TODAY!!!" (*Id.* at 9 (emphasis in original).)  The issue was resolved by 2:14 pm.  (Doc. 174, ¶ 122.)

On January 7, 2021, Badaczewski again logged in as Durenleau and emailed the spreadsheet containing Durenleau's passwords to Durenleau's personal email account and then to her work email account.  (*Id.* ¶¶ 139, 155.)  The password spreadsheet contained "usernames, passwords and other credentials" for the various web portals that NRA used in its debt collection business.  (*Id.* ¶ 219.) These portals contain personal information of consumers "including names, dates of birth, social security numbers, utility bills, medical bills, financial account information, and other information."  (*Id.* ¶ 220, 228.)

The spreadsheet also contained NMLS credentials for Durenleau, Kusic, and his wife, Jill Kusic.[2]  (*Id.* ¶ 317.)  These credentials allow access to a portal containing personal information regarding the Kusics, such as social security numbers, dates of birth, address, telephone, e-mail, background checks and credit reports.  (*Id.* ¶ 322.)

---

[2] Jill Kusic is a co-owner and head legal counsel of NRA. (*Id.* ¶ 316.)

On January 22, 2021, Durenleau sent an e-mail to supervisors at NRA regarding moving accounts out of the compliance "workgroup."[3]  (*Id.* ¶ 361.)  This email prompted her supervisor, Lisa Daube, to ask Durenleau what she meant by the email.  (*Id.* ¶ 362.)  The two had a meeting where Durenleau explained her concerns and gave an example.  (*Id.* ¶¶ 364, 365.)  Daube did not agree with the concern Durenleau raised or her example of moving accounts.  (*Id.* ¶ 366.)

NRA conducted an audit of account movement in January 2021.  (*Id.* ¶ 367.) Anita Schaar ("Schaar"), Director of Internal Controls, performed the audit.  (*Id.* ¶¶ 367–69.)[4]  The audit showed that Durenleau moved 146 accounts that month, and eleven had been moved after payment was received.  (*Id.* ¶¶ 382, 383.)  This troubled Schaar because she believed there was no further work to be done on these accounts, and by moving them, Durenleau would be credited for a bonus on an account that had no further work to be done.  (*Id.* ¶ 378, 381.)  However, Durenleau testified there could be additional work done after payment was received.  (Doc. 161-7, pp. 35–36.)[5]  Durenleau testified she did work on these

---

[3] "NRA uses workgroups to identify whether a collection action belongs to a specific employee for purposes of bonuses and commissions."  (*Id.* ¶ 345.)  In order to receive a bonus at NRA, an employee had to "do something" on an account. (*Id.* ¶ 343.)  What exactly this "something" amounts to is unclear from the record.  It is undisputed that Durenleau moved accounts into her "workgroup" so that she could receive a bonus regarding these accounts. (*Id.* ¶¶ 352, 353.)

[4] Schaar's credibility is disputed because she does not have firsthand knowledge of how bonusing works at NRA.  (*Id.* ¶¶ 377–84.)

[5] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

accounts and moving these accounts was permitted because she had different "ground rules" than the collectors.  (Doc. 161-7, p. 34; Doc. 161-19, p. 33; Doc. 162-15.)  While Schaar was performing the audit, Durenleau called Schaar asking if she did something wrong.  (Doc. 174, ¶ 387.)  Various employees testified that they considered what Durenleau did to be fraud and/or theft.  (*Id.* ¶¶ 390–397.)  Durenleau moved a total of $3,042.85 in payments in January 2021.  (*Id.* ¶ 358.)  Durenleau received a corrective action on February 2, 2021, outlining the allegedly fraudulent activity, and warning Durenleau that she would be terminated with her next violation, but she was not terminated at that time.  (*Id.* ¶¶ 758–60.)

### B.  Facts Relating to Durenleau's Harassment Claims

Within one year of her hire in 2014, in a one-on-one meeting in a conference room, Kusic "suggested that Kusic and Durenleau picture each other naked to assist with Durenleau's fear of public speaking."  (Doc. 174, ¶ 461.)  Kusic made comments multiple times to Durenleau, stating "oh here's the blonde again" and "I'm talking to a blonde," referencing her hair color at the time and implying she was dumb.  (*Id.* ¶ 462.)  Around 2016 or 2017, Kusic referenced another employee who went skinny dipping with him and speculated whether Durenleau would do the same.  (*Id.* ¶¶ 467, 568.)  Durenleau immediately reported this comment to Sharma, who took no action regarding it.  (*Id.* ¶ 469.)

Sometime between 2014 and 2016, Tasey Leitzell, an HR employee, Schaar, and Sharma joked in Durenleau's presence that Durenleau should sleep with Kusic so that Kusic would stop bothering them.  (*Id.* ¶¶ 475, 476.)  Durenleau responded to this statement by laughing and stating "that would be disgusting[,]" "[he] can't afford me[,]" and "I would never take anything from [Kusic] to blow him or to screw him."  (*Id.* ¶¶ 481–83.)

Between 2016 and 2019, Kusic asked Durenleau "how well does your man have it at home."  (*Id.* ¶ 486.)  Sometime in 2017 or 2018, Kusic wiped a cheese curl over Durenleau's lips and gave her a "funny look."  (*Id.* ¶ 492.)  In 2019, there was a malware incident at NRA and employees openly speculated that it was because Kusic was watching pornography in his office.  (*Id.* ¶ 499.)

On an unspecified date, Sharma relayed comments to Durenleau that other people were making about her clothing.  (*Id.* ¶ 504.)  The content of these comments is disputed, as NRA, Kusic, and Sharma characterize the comments as Sharma telling Durenleau that an HR employee thought her "pants were too tight or her skirt was too short," and Durenleau claims Sharma told her "how [she was] a whore and, you know, your pants are too tight, or your skirt's too short."  (*Id.* ¶ 504.)

In 2015 or 2016, Sharma made several comments regarding another employee's weight including that she focused on food more than work, that this

employee's desk would need cleaned from being full of food and made faces insinuating this employee was fat. (*Id.* ¶¶ 511–16.) Sharma made multiple comments during Durenleau's employment about how large a female employee's breasts were. (*Id.* ¶ 529–26.)

Throughout Durenleau's entire employment at NRA, fellow employee Tasey Leitzell would comment loudly in her office "[i]f these trifling bitches would learn how to swallow, we wouldn't have to pay for their welfare[]" and "I'm so over this job; having to clean the bathroom up after people; and then bitching about their welfare." (*Id.* ¶¶ 552–53.)

In 2020, Sharma made comments in Durenleau's presence about a female employee he was sexually interested in. (*Id.* ¶ 528.) Also in 2020, after Durenleau interviewed Badaczewski, Durenleau, Sharma, and the head of HR met regarding whether they should hire Badaczewski. (*Id.* ¶¶ 543, 546.) During this meeting, one of the two men commented that Badaczewski was the type of girl Kusic liked. (*Id.* ¶ 548.) In response, Durenleau stated, "you guys are gross [. . .] I could get her before you." (*Id.* ¶ 549.) Either Sharma or the head of HR requested that Durenleau record any sexual relations between her and Badaczewski and send it to them. (*Id.* ¶ 550.)

Durenleau testified that every day Sharma would put his arm around her hip or shoulder in greeting. (*Id.* ¶¶ 561–62.) He also gave her shoulder and neck rubs.

(*Id.* ¶ 565.)  Once, while Sharma had his arm around Durenleau, he "brushed down [Durenleau's] back and brushed over [her] butt."  (*Id.* ¶ 567.)  Durenleau did not tell Sharma not to hug her, but she did report this incident to HR.  (*Id.* ¶ 566.)

On November 20, 2020, Durenleau was in her office with several of her direct reports on speaker phone with a co-worker in another office building who was complaining about a different co-worker.  (*Id.* ¶¶ 577, 579.)  Sharma walked down the hall and witnessed the end of the conversation.  (*Id.* ¶ 582.)  Sharma then entered Durenleau's office, directed her direct reports to leave, and closed the door. (*Id.* ¶ 586.)  While discussing the appropriateness of criticizing other co-workers in front of her direct reports, Sharma slapped Durenleau on the face.  (*Id.* ¶¶ 595.)  He then said "I'll take care of it on Monday" and abruptly left.  (*Id.*)

Durenleau reported the incident to in-house counsel later that day, who advised her to write everything down.  (*Id.* ¶¶ 597–98.)  Durenleau handwrote a statement that night and then emailed it to in-house counsel on Monday.  (*Id.* ¶¶ 600–01.)  After receiving the statement, in house counsel emailed Durenleau theorizing that this complaint arose from Durenleau feeling insecure in her job and suggested how "a feeling of job insecurity could lead to interpreting a paternalistic pat on the cheek that felt a bit more firm than usual, followed by a quick departure. But, that interpretation appears to have been mistaken.  Your job is secure."  (Doc. 174-8, p. 2.)  Durenleau reported this incident to the Camp Hill Police on February

25, 2021.  (*Id.* at ¶ 641.)  Sharma was convicted of criminal harassment on May 6, 2021.  (Doc. 143, ¶ 170.)

Durenleau resigned from NRA on February 21, 2021, and took a position as a permitting and licensing manager at West Shore Homes.  (Doc. 174, ¶ 779.)  In her resignation letter Durenleau stated,

> I have been targeted and harassed at NRA Group, LLC for some time now.  The harassment was taken to a whole new level when Shell Sharma slapped me across my face the end of November last year.  Ever since I made my complaint, I have been targeted to force me out of my job.  Emotionally, I cannot take this any more, and am therefore resigning to free myself from this environment.

(Doc. 161-9, p. 16.)

### C. Facts relating to Badaczewski's Harassment Claims[6]

Badaczewski testified that she was subjected to sexual harassment "all day, every day" during her employment at NRA, estimating there was at least 120 incidents.  (Doc. 174, ¶ 829.)  On one occasion, Kusic told Badaczewski that men liked her because she had big boobs and blonde hair.  (*Id.* ¶ 833.)  Kusic frequently questioned her intelligence, referencing her blonde hair.  (*Id.* ¶ 834.)  Badaczewski and Kusic would discuss Badaczewski's sex life, and Kusic would comment on it. (*Id.* ¶ 836.)  Badaczewski testified in an interview with a detective related to this

---

[6] The court notes that Plaintiff alleges a multitude of other facts regarding Badaczewski's character, such as facts showing that Badaczewski has a "drinking problem" due to her texting Kusic while intoxicated and her criminal record reflecting a public intoxication charge. .   The court is not including the extraneous facts alleged by Plaintiff in this section because they have no bearing on the resolution of the pending motions.

case, "he never touched me, he never made advances at me.  But he made

comments about, like, my body and me having sexual intercourses with men."

(Doc. 162-7, p. 19.)  On January 28, 2021, Badaczewski emailed HR regarding

Kusic being condescending, not training her, and insulting her intelligence, and she

also told other supervisors that Kusic was "constantly talk[ing] about me being

blonde and having big boobs."  (Doc. 161-13, pp. 24–25; Doc. 174, ¶ 866.)

Badaczewski allegedly kept a notebook containing all of the incidents of sexual

harassment, but she no longer knows where that notebook is.  (Doc. 174, ¶¶ 875–

82.)

On March 19, 2021, Badaczewski and Kusic took a trip to two local candy

stores in order to buy candy for clients and an office event.  (*Id.* ¶ 889.)[7]  On this

trip, Kusic bought Badaczewski candy and then asked if other guys buy her as

many gifts as he does. (Doc. 161-11, p. 220.)  While they were on this trip,

personnel at NRA discovered that Badaczewski had been the person to log in to

Durenleau's account on January 6 and 7.  (Doc. 174, ¶ 901.)  Upon his return to the

office, Kusic became aware of this fact and decided to terminate Badaczewski's

employment.  (*Id.*)  Badaczewski's desk was emptied the next day, March 20,

---

[7] Plaintiff's counsel quibbles that Badaczewski "falsely" alleged the two went to "Hershey Park" when they actually went to "Hershey's Chocolate World." (Doc. 161-4, p. 124.)  The court notes that these two locations are next to each other, share a parking lot, and can be referenced collectively.

2021.  (*Id.* ¶ 910.)  Badaczewski arrived at the office that day and was presented a

corrective action report which terminated her employment.  (*Id.* ¶ 915.)

### D. Procedural History

NRA filed the initial complaint on April 16, 2021, which named only

Durenleau as a defendant, alleging one count of violation of the CFAA.  (Doc.1.)

On May 19, 2021, NRA filed an amended complaint adding Badaczewski and

three more CFAA claims, a violation of the Defend Trade Secrets Act ("DTSA"), a

violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), a civil

conspiracy claim, a breach of common law duty of loyalty claim, and a fraud claim

against Durenleau only.  (Doc. 8.)  Thereafter, on June 18, 2021, Durenleau

answered the complaint and raised counterclaims against NRA including a claim of

negligent hiring and retention, alleging various inappropriate comments made by

NRA employees and the slap incident with Sharma.  (Doc. 16.)  On July 20, 2021,

Badaczewski answered the complaint, raising one count of sexual harassment

under Title VII, one count of quid pro sexual harassment under Title VII, and one

count of retaliation under Title VII.  (Doc. 24.)

On July 28, 2021, Durenleau filed an amended answer, alleging one count of

sexual harassment under Title VII, one count of quid pro sexual harassment under

Title VII, and one count of retaliation under Title VII.  (Doc. 25.)  NRA answered

Badaczewski's counterclaims on August 10, 2021.  (Doc. 31.)  NRA answered

Durenleau's counterclaims on August 17, 2021.  (Doc. 33.)  Over one year of highly contentious discovery followed.

Durenleau and Badaczewski were granted leave to amend their counterclaims on November 10, 2022.  (Doc. 141.)  Thereafter, on November 10, 2022, both Durenleau and Badaczewski filed amended answers with counterclaims, adding Kusic and Sharma as counterclaim defendants by adding PHRA claims which mirrored the Title VII claims but also alleged individual liability.  (Docs. 142, 143.)  NRA, Kusic, and Sharma answered the amended counterclaims on November 23, 2022.  (Docs. 144, 145.)

The parties filed simultaneous motions for summary judgment on May 15, 2023.  (Docs. 158, 161.)  Both motions have been fully briefed and are now ripe for disposition.

## JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. §§ 1331 because all parties bring claims arising from federal statutes. This court also has supplemental jurisdiction over state law tort and PHRA claims under 28 U.S.C. § 1367 because the state law claims are sufficiently related to the federal claims.  Venue is appropriate under 28 U.S.C. § 1391 because all actions or omissions alleged occurred in the Middle District of Pennsylvania.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

DISCUSSION

The court will first address NRA's claims against Durenleau and Badaczewski, on which there are competing motions for summary judgment. The court will then review Durenleau's and Badaczewski's counterclaims, on which NRA, Kusic, and Sharma have moved for summary judgment.

## A. NRA's Claims against Durenleau and Badaczewski

The court will begin with Durenleau and Badaczewski's motion for summary judgment because the court's resolution of their motion will resolve each of these claims. Durenleau and Badaczewski argue that there is no evidence supporting any of NRA's claims, which entitles them to judgment as a matter of law. (Doc. 160.) Conversely, NRA argues they are entitled to judgment as a matter of law because the facts underlying all of the claims in their amended complaint are undisputed. (Doc. 172.)

### 1. Computer Fraud and Abuse Act Claims

NRA brings four claims of computer fraud under the CFAA all relating to the incident on January 6 and 7, 2021 when Durenleau was asked by her superiors to resolve a work issue while out of the office on COVID leave, without access to a work computer.[8] It is undisputed that Durenleau asked Badaczewski to access

---

[8] Count 1 alleges a violation of 18 U.S.C. § 1030(a)(2)(C). (Doc. 8.) Count 2 alleges a violation of 18 U.S.C. § 1030(a)(4). (*Id.*) Count 3 alleges a violation of 18 U.S.C. §1030 (a)(5)(c). (*Id.*) Count 4 alleges a violation of 18 U.S.C. § 1030 (a)(6). (*Id.*)

Durenleau's desktop to send Durenleau her passwords in order to enable Durenleau to resolve this issue.  Durenleau and Badaczewski argue there is no evidence showing they exceeded their authorized access in violation of the CFAA because they were both authorized to access NRA's computer systems by virtue of their employment, Durenleau's position as compliance manager, and the implicit demands by supervisors to complete this task.  (Doc. 160, pp. 12–17.)  They also argue that there is no evidence of intent to defraud under subsections (a)(4) and (a)(6).  (*Id.* at 17–19.)  NRA responds that neither Durenleau nor Badacezwski were authorized to access the NRA computers because they were not authorized to access the NRA computer system from their homes, and Badaczewski's entry into Durenleau's desktop was unauthorized access in contravention of NRA computer and security policies.  (Doc. 172, pp. 8–13.)

The purpose of the CFAA is to "address the growing problem of computer hacking, recognizing that, '[i]n intentionally trespassing into someone else's computer files, the offender obtains at the very least information as how to break into that computer system.'"  *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012); *see also Dresser-Rand Co. v. Jones*, 957 F. Supp. 2d 61, 613–14 (E.D. Pa. 2013) (analogizing the limitations of the CFAA as akin to burglary).  Additionally, courts within this Circuit have cautioned that:

> The CFAA "remains primarily a criminal statute designed to combat hacking," and, as such, jurisprudential care should be taken not to

"contravene Congress's intent by transforming a statute meant to target hackers into a vehicle for imputing liability to [defendants] who access computers or information in bad faith."

*Christian v. Lannett Co.*, No. 16-963, 2018 U.S. Dist. LEXIS 52793, at *16 (E.D. Pa. Mar. 29, 2018) (quoting *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 590 (E.D. Pa. 1990)).  With this background and purpose in mind, the court turns to the claims at hand.

Because it is the broadest subsection, the court starts with Count III, alleging a violation of 18 U.S.C. § 1030(a)(5)(C), which provides, "[w]hoever . . . (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss . . . shall be punished as provided in subsection (c) of this section."  While "authorization" under the CFAA has not yet been defined by the Third Circuit, courts within the circuit have explained that "an employee is 'authorized to access a computer when his employer approves or sanctions his admission to that computer.'" *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d. 659, 670 (E.D. Pa. 2018) (quoting *Dresse*r–*Rand*, 957 F. Supp. 2d at 617).  Further, "those who have permission to access a computer for any purpose, such as employees, cannot act 'without authorization' unless and until their authorization to access the computer is specifically rescinded or revoked."  *QVC, Inc.*, 159 F. Supp. at 595.

Indeed, "an employee granted access to a computer in connection with his [or her] employment is 'authorized' to access that computer under the CFAA regardless of his or her intent or whether internal policies limit the employee's use of the information accessed." *ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C.*, No. 3:11-CV-2213, 2016 U.S. Dist. LEXIS 88774, at *27 (M.D. Pa. July 7, 2016) (collecting cases), *report and recommendation adopted by* 2016 U.S. Dist. LEXIS 99608 (M.D. Pa. July 29, 2016).

It is undisputed that Durenleau and Badaczewski were authorized to access the NRA computer system by virtue of their employment with NRA. (Doc. 159, ¶ 8; Doc. 174, ¶ 161.)[9] Because both Durenleau and Badaczewski were authorized to access the protected computer, there is no violation of 18 U.S.C. § 1030(a)(5)(C), and Durenleau and Badaczewski's motion for summary judgment will be granted as to Count III.

Counts I and II allege violations under §§ 1030(a)(2)(C)[10] and (a)(4),[11] which prohibit unauthorized access as well as exceeding one's authorization. The

---

[9] NRA's argument that Durenleau was not "authorized" to access her files from home is actually arguing that Durenleau exceeded the authorization given to her by accessing her files in a manner that is proscribed by NRA's computer use policies, as will be explained below.

[10] "Whoever . . . (2) intentionally accesses a computer without authorization or exceeds authorized access and thereby obtains . . . (c) information from any protected computer . . . shall be punished as provided in subsection (c) of this section." 18 U.S.C. § 1030(a)(2)(C).

[11] "Whoever . . . (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the

21

CFAA defines "exceed[ing] authorized access" as "access[ing] a computer with authorization and [using] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  The recent Supreme Court case *Van Buren v. United States*, 141 S. Ct. 1648 (2021), sheds light on the appropriate interpretation of "exceeds authorized access."  In *Van Buren*, a police officer used a police department database, which he was authorized to access by virtue of his employment, to run a license plate search for someone who had bribed him to do so.  *Id.* at 1652.  The United States argued the phrase:

> "is not entitled so to obtain" refers to "the information not allowed to [be] obtain[ed] *in the particular manner or circumstances in which he obtained it.*  The manner or circumstances in which one has a right to obtain information . . . are defined by any "specifically and explicitly" communicated limits to one's right to access information.

*Id.* at 1654–55 (emphasis in original).  In contrast, Van Buren argued that the statute requires a "gates-up-or-down" inquiry, and that since he was authorized to access the computer, it did not matter that he later used that access in contravention of department policies.  *Id.* at 1658–59.

---

intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period . . . shall be punished as provided in subsection (c) of this section." § 1030(a)(4).

The Court adopted Van Buren's argument and reasoned that interpreting "authorization" and "exceeding authorization" to mean "one either can or cannot access a computer system, and one either can or cannot access certain areas within the system[]" aligns better with "the computer-context understanding of access as entry." *Id.* at 1658–59. The Court further disavowed relying on computer use policies as the basis for liability under the CFAA, because "[i]f the 'exceeds authorized access' clause criminalizes every violation of a computer-use policy, then millions of otherwise law-abiding citizens are criminals." *Id.* at 1661.[12]

Here, Durenleau was authorized to access her computer and the files within that computer by virtue of her employment at NRA and having the credentials to access their computer system. NRA's argument that she was not "authorized" to access her computer at home because NRA computer policies forbid such a practice is actually arguing that she exceeded her authorized access by accessing her computer in a prohibited manner. NRA's argument is that: Durenleau's authorization to access the computer was given to her by virtue of her employment; NRA does not allow their employees to use their authorized access in a certain

---

[12] Other courts have also warned against basing CFAA liability on violations of internal policies because doing so would "allow[] private parties to manipulate their computer-use and personnel policies so as to turn these relationships into ones policed by the criminal law." *Nosal*, 676 F.3d at 860. *See also Carnegie Strategic Design Engineers, LLC v. Cloherty*, No. CIV.A. 13-1112, 2014 WL 896636, at *9 (W.D. Pa. Mar. 6, 2014) ("Plaintiff cannot state a claim under the CFAA by transforming its employee policies which prohibited the using of the computer system for anything other than business purposes into a violation of the CFAA.").

way, i.e. from their homes without specific equipment; and Durenleau accessed her computer in a way not authorized by company policy.  Accordingly, accepting NRA's argument that Durenleau exceeded authorized access by accessing the computer in the wrong way would require the court to utilize the definition of "exceeding authorized use" that the Supreme Court rejected in *Van Buren*.

The definitional limitation established in *Van Buren* is particularly significant in light of the purpose of the CFAA.  As explained in *Dresser-Rand Co.*,

> An analogy to burglary provides clarity to the limitations of the CFAA: "If a person is invited into someone's home and steals jewelry while inside, the person has committed a crime—but not burglary—because he has not broken into the home. The fact that the person committed a crime while inside the home does not change the fact that he was given permission to enter." Thomas E. Booms, *Hacking into Federal Court: Employee "Authorization" Under the Computer Fraud and Abuse Act,* 13 VAND. J. ENT. & TECH. L. 543, 571 (2011).

*Dresser-Rand Co.*, 957 F. Supp. 2d at 614.  Applying this burglary analogy here shows why Badaczewski and Durenleau are not liable under the CFAA.  Both had permission to enter the (metaphorical) home.  Instead of entering the home through the door, they entered through a window.  Conditioning their entry into the home upon only using the door does not make their subsequent entry through the window a burglary.  It may be a reason to not invite them back to the home, but it is not a burglary.

Thus, applying the appropriate definition, there is no issue of material fact regarding whether Durenleau was authorized to access the computer system, generally, and her files, specifically.  Further, she did not exceed her authorized access by emailing a work document to her personal email.  Although these actions may have violated NRA's computer use policies, she was authorized to access those files by virtue of her employment.  In other words, Durenleau came in through the window rather than the door, which is not a violation of the CFAA.

Additionally, NRA argues that Badaczewski exceeded her authorization by logging into Durenleau's desktop, accessing the spreadsheet, and emailing it to Durenleau's personal email address because Badaczewski was not authorized to access Durenleau's files.  (Doc. 163, p. 40.)  NRA argues that no person at NRA explicitly told Durenleau or Badaczewski to take this course of action, and thus, Badaczewski's access of Durenleau's computer was unauthorized.  (*Id.* at 34.)  While Durenleau was not explicitly told "share your NRA password and let Jamie Badaczewski log in to your computer and send you your passwords," as NRA seems to think the statute requires, the context of this incident shows that Durenleau authorized Badaczewski to access this information.

Durenleau, the senior compliance manager, was at home sick with COVID, when her superiors brought an urgent work issue to her attention.  She was denied a company computer to access the computer system at home and could only access

her company e-mail account through her personal cell phone.  In order to solve this issue, she needed to give her supervisor a password to an online portal.  The CEO of NRA then began emailing Durenleau, emphasizing that she needed to fix the problem by the end of the day and that how she did that was her "problem." Accordingly, in order to perform her job without the necessary computing devices, she authorized her co-worker to access her own files and locate the needed password.  The next day, Durenleau directed Badaczewski to send the whole spreadsheet.  These circumstances are a far cry from the hacking that the CFAA was enacted to prevent.

While having Badaczewski access Durenleau's desktop and send the password spreadsheet may have been a violation of NRA policies and worthy of an employment sanction, it is not a violation of the CFAA.  Therefore, neither Durenleau nor Badaczewski accessed a protected computer without authorization or exceeded their authorization.  As a result, Durenleau and Badaczewski's motion for summary judgment will be granted as to Counts I and II.

Count IV alleges a violation of 18 U.S.C § 1030(a)(6), which provides:

> Whoever . . . knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if . . . such trafficking affects interstate or foreign commerce . . . shall be punished as provided in subsection (c) of this section.

In the copious briefing in this case, neither party has provided the court with a definition of "intent to defraud" as used in the CFAA.  However, other courts have held that, under the CFAA, an intent to defraud "only requires a showing of unlawful access; there is no need to plead the elements of common law fraud to state a claim under the Act." *eBay Inc. v. Digital Point Sols., Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009) (citing *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008)).

NRA's argument regarding whether Durenleau and Badaczewski had an intent to defraud consists of restating its allegations that Durenleau and Badaczewski were not authorized to take these actions, pointing to Durenleau's statement that giving her NMLS credentials to her supervisor would have been "dumb" because her supervisor did not like her, arguing that Badaczewski's access to Durenleau's desktop exceeded Badaczewski's authorized access, and arguing that sending the password spreadsheet in an unencrypted email shows Durenleau and Badaczewski "knowingly and intentionally exposed the confidential information [NRA] is entrusted with protecting, but did so with the clear intent to use the information to cause [NRA] financial and reputational harm."  (Doc. 172, pp. 17–19.)  NRA also attempts to support their assertion that Durenleau or Badaczewski further disseminated the spreadsheet by pointing to testimony of Sharma, where he speculates that NRA losing their $10 million cyber insurance

coverage six months after the incident was due to the emailed spreadsheet because Durenleau was one of the only people who knew of this coverage and that a recent fraudulently filed unemployment claim under Kusic's name was due to the personal information contained in the spreadsheet. (*Id.* at 18.)

As explained above, Durenleau and Badaczewski did not unlawfully access NRA's computers. There is no further evidence in the record, beyond Sharma's unsubstantiated speculation, showing an intent to defraud NRA in any way. Speculations are not sufficient to support summary judgment, and therefore, Durenleau and Badaczewski's motion for summary judgment will be granted as to Count IV. *See Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018).

### 2.  Trade Secrets Claims

NRA brings one count of violating the DTSA[13] and one count of violating the PUTSA[14] on the premise that the password spreadsheet allowed access to the multiple online portals utilized by NRA, which contain personal and confidential information of its customers and consumers. (Doc. 172, p. 20.) Durenleau and Badaczewski argue that the password spreadsheet does not contain trade secrets because the passwords do not have independent economic value. (Doc. 160,

---

[13] 18 U.S.C. § 1836.

[14] 12 Pa. Con. Stat. § 5306.

p. 20.)  NRA responds that the password spreadsheet is a trade secret because the passwords on that spreadsheet would allow access to a "myriad" of customers' personal information which has value to cyber criminals.  (Doc. 163, p. 49.)

Because the DTSA and PUTSA protect the same type of information, the court will consider these claims together.  *PharMerica Corp. v. Sturgeon*, No. 2:16-CV-1481, 2018 WL 1367339, at *4 (W.D. Pa. Mar. 16, 2018).  Under both the DTSA and PUTSA, a trade secret is "information that: (a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use."  *Id.* at *4.

> To determine whether information is a trade secret, a court must consider:
>
> the extent to which the information is known outside of the owner's business, the extent to which it is known by employees and others involved in the owner's business, the value of the information to the owner and his competitors, the amount of effort or money expended in developing the information, and the ease or difficulty with which the information could be acquired or duplicated by others. *S.I. Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1256 (3d Cir.1985).

*Crown Coal & Coke Co. v. Compass Point Res., LLC*, No. CIVA 07-1208, 2009 WL 891869, at *6–7 (W.D. Pa. Mar. 31, 2009)*; see also Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d. Cir. 2010).

Additionally, "[a] compilation of data that has independent economic value can be protected as a trade secret." *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617 (E.D. Pa. 2014). Further, "compilation of customer data may qualify as a trade secret if it is not readily obtainable from another source and was generated in such a fashion that it constitutes intellectual property of the owner." *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 409 (E.D. Pa. 2009).

Durenleau and Badaczewski rely on *State Analysis, Inc. v. American Financial Services Association*, 621 F. Supp. 2d 309 (E.D. Va. 2009), for their argument that passwords cannot be trade secrets. In *State Analysis*, defendant, a former customer of plaintiff, shared its passwords which accessed plaintiff's databases, with one of plaintiff's competitors. *State Analysis*, 621 F. Supp. 2d at 314. The court held that passwords themselves are not information but rather are a barrier to the information which is properly called a trade secret. *Id.* at 321. The court further reasoned that "[a]lthough the passwords at issue clearly have economic value . . . , they have no *independent* economic value in the way a formula or a customer list might have." *Id.* (emphasis in original).[15]

---

[15] NRA distinguishes this case by arguing that it applies the Virginia trade secrets law. However, as with the Pennsylvania trade secrets law, the Virginia trade secrets law is essentially the same as the federal trade secrets act. Further, the two cases NRA cited to support its argument are both from California and apply the California trade secrets law.

NRA cites two cases for the proposition that passwords can be trade secrets. (Doc. 163, p. 48.)  However, both of these cases were decided at the motion to dismiss stage and held that passwords coupled with other information could state a claim for misappropriation of trade secrets.  *PhoneDog v. Kravitz*, No. C 11-03474, 2011 WL 5415612 (N.D. Cal. Nov. 8, 2011); *TMX Funding, Inc. v. Impero Techs., Inc.*, No. C 10-00202 JF (PVT), 2010 WL 2509979, at *3 (N.D. Cal. June 17, 2010).  As such, these cases are not persuasive, and the court will apply *State Analysis*, which is more relevant to the analysis here.

The password spreadsheet has no value outside of the access it gives to the web portals.  The information on the web portals themselves may potentially be trade secrets, but that information was not shared and is not at issue here.  NRA advances plenty of arguments regarding the various web portals the passwords access and the confidentiality of the information therein, but these arguments do not prove that the passwords have any independent economic value.  Rather, these arguments show that the spreadsheet itself has no independent value; the value is in portals that the passwords access.  Accordingly, the password spreadsheet has no independent economic value and is not a trade secret.  Thus, Durenleau and Badaczewski's motion for summary judgment will be granted as to Counts V and VI.

### 3. Civil Conspiracy

Durenleau and Badaczewski argue they are entitled to summary judgment on the civil conspiracy claim, Count VII, because there are no facts supporting malicious intent for either of them. (Doc. 160, pp. 23–24.) NRA argues that a conspiracy should be inferred from Durenleau and Badaczewski's communications on January 6 and 7, 2021 when they agreed to violate the CFAA, DTSA and PUTSA. (Doc. 163, p. 65.)

In Pennsylvania, a civil conspiracy requires a showing of "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Bro-Tech Corp*, 651 F. Supp. 2d at 418. Moreover, "[p]roof of malice, i.e., an intent to injure, is essential in proof of a conspiracy . . . . Malice requires . . . that the *sole* purpose of the conspiracy was to injure the plaintiff,' and that this intent was without justification." *Synthes*, 25 F. Supp. 3d at 735–36 (quoting *Doltz v. Harris & Assoc.*, 280 F. Supp. 2d 377, 389 (E.D. Pa. 2003)). Finally, a civil conspiracy claim must be based on an underlying tort, and "only a finding that the underlying tort has occurred will support a claim for civil conspiracy. *Id.*

Here, because the court has found that Durenleau and Badaczewski did not violate the CFAA, DTSA, or PUTSA, there can be no civil conspiracy to engage in

some type of unlawful activity.  Moreover, there is no evidence in the record

demonstrating any intent to harm NRA by their actions on January 6 and 7, 2021.

NRA argues that Durenleau and Badaczewski's knowledge of the computer and

confidentiality policies, and then their subsequent violation of them, show an intent

to injure NRA.  (Doc. 172, p. 30.)  However, the malice requirement demands that

the only purpose of the conspiracy is to injure the plaintiff.  *Synthes*, 25 F. Supp.

3d at 736.  Here, there is sufficient evidence that Durenleau and Badaczewski were

trying to help NRA by resolving the licensing issue, despite not being set up to

succeed by NRA.  Therefore, Durenleau and Badaczewski's motion for summary

judgment will be granted as to Count VII.

### 4.  Breach of Common Law Duty of Loyalty

Durenleau and Badaczewski argue they are entitled to summary judgment on

Count VIII, breach of common law duty of loyalty, because there is no evidence

that they used the password spreadsheet to compete with NRA.  (Doc. 160, p. 26.)

NRA argues that creating and sending the password spreadsheet was contrary to

NRA's interests, and that Durenleau's alleged mishandling of a license issue was

also contrary to NRA's interests.  (Doc. 172, pp. 39–42.)

To prove a claim of breach of the common law duty of loyalty in

Pennsylvania, a plaintiff must show there was an agency relationship and that:

> [1] the defendant negligently or intentionally failed to act in good faith
> and solely for the benefit of plaintiff in all matters for which he or she

was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit . . . was a real factor in bring[ing] about plaintiff's injuries.

*McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998).

Further, the agent must:

refrain from competing with the principal and from taking action on behalf of, or otherwise assisting, the principal's competitors throughout the duration of the agency relationship, as well as . . . not to use property or confidential information of the principal for the agent's own purpose or those of a third party.

*Synthes*, 25 F. Supp. 3d at 667 (citing RESTATEMENT (THIRD) OF AGENCY §§ 8.04, 8.05).

Here, there is no evidence that Durenleau or Badaczewski used this spreadsheet to compete with NRA at all. As NRA points out, liability for breach of common law duty of loyalty can also be founded upon using the principal's property or confidential information for the agent's own purposes or a third party's. *See* RESTATEMENT (THIRD) OF AGENCY § 8.04. However, there is also no evidence that Durenleau or Badaczewski used the information in any way other than to resolve the licensing issue on January 6, 2021, as requested.

NRA argues that the mere creation and sending of the spreadsheet contrary to NRA policies shows that Durenleau and Badaczewski acted against NRA's interests. However, the evidence of record shows that Durenleau and Badaczewski were acting in NRA's interest by trying to resolve the license issue and did not use

the spreadsheet or the information in it for any other reason than to complete their job duties.

NRA also argues that Durenleau breached her duty of loyalty to NRA by failing to respond to a deficiency notice sent on January 29, 2021, regarding the same license that was the issue on January 6, 2021. (Doc. 172, p. 41.) This issue is raised in the brief supporting NRA's motion for summary judgment and tangentially in the brief in opposition to Durenleau's motion. (Doc. 163, p. 73.) Durenleau argues that this issue is being raised for the first time on summary judgment, and therefore, should not be considered by the court. (Doc. 173, p. 23.) NRA argues that raising this issue for the first time on summary judgment is appropriate because the license at issue is the same one the parties were trying to resolve on January 6, 2021, such that Durenleau had notice that this license was at issue, NRA requested documents in discovery regarding this license, and Durenleau could have questioned Sharma about the license, but chose not to. (Doc. 180, p. 15.)[16]

Third Circuit precedent dictates that "a claim that has not been timely raised is waived." *Spence v. City of Phila.*, 147 Fed. App'x 289, 291 (3d Cir. 2005). The

---

[16] NRA continuously faults Durenleau and Badaczewski for not addressing the Wyoming license issue in their briefing; however, this issue was not raised as support for the breach of duty of loyalty claim until the summary judgment stage. As the parties filed simultaneous briefs, it is understandable that Durenleau and Badaczewski did not address an argument not yet raised. Durenleau and Badaczewski raise counter arguments in their briefing in opposition to NRA's motion.

Third Circuit has also previously held that a plaintiff should have moved to amend their complaint during discovery when discovery produced evidence of an additional claim. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 642 (3d Cir. 1993). Here, NRA is not permitted to modify their claims on summary judgment by changing the factual basis for one of the claims. If NRA had wanted to base their breach of duty of loyalty claim on this factual scenario, it could have filed a motion to amend their complaint, as it evidently was aware of this situation as early as February 25, 2021. Accordingly, Durenleau and Badaczewski's motion for summary judgment will be granted on the breach of duty of loyalty claim, Count VIII.

### 5. Fraud

NRA's final claim is against Durenleau alone and alleges that she committed fraud against NRA by moving certain accounts into her workgroup such that she could receive a bonus based on these accounts. (Doc. 8.) Durenleau argues that there is no evidence showing that she acted with knowledge and intent to defraud. (Doc. 160, p. 27.) NRA responds that she knew the rules for collecting bonuses and moved accounts into her workgroup after payment was made, meaning that she did not perform any work on those accounts entitling her to a bonus. (Doc. 172, p. 44.)

A fraud claim in Pennsylvania law consists of six elements:

> (1) (a) A misrepresentation or (b) A concealment; (2) Which is material to the transaction at hand; (3) (a) Made with knowledge of its falsity or recklessness as to whether it is true or false (for a misrepresentation), or (b) Calculated to deceive (for a concealment); (4) With the intent of misleading another into relying on it; (5) Justifiable reliance on the misrepresentation; and (6) A resulting injury proximately caused by such reliance.

*SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 205 (3d Cir. 2022).

Additionally, "[f]raud consists of 'anything calculated to deceive, whether by single act or combination or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.'" *Am. Indep. Ins. Co. v. Lederman*, No. CIV.A. 97-4153, 2000 WL 1209371, at *14 (E.D. Pa. Aug. 25, 2000) (quoting *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991)).

NRA argues that it was company policy that an employee "do something" on an account in order for them to receive a bonus. It also argues that after the account had closed, there was no more work to do, so no one could then receive a bonus on it. Durenleau allegedly transferred accounts into her work group after they had closed in order for her to receive a bonus off those accounts.

However, Durenleau has presented sufficient evidence that different rules applied to her for receiving a bonus. (Doc. 161-7 p. 34; Doc. 161-19, p. 33; Doc. 162-15, p. 41.) The only evidence NRA presents to show that Durenleau knew that moving these accounts was wrong was when she called Schaar during the audit and

asked whether she did anything wrong.  (Doc. 174, ¶ 387.)  The court declines to infer from that statement that Durenleau admitted guilt, but rather, that she did not know she was doing something wrong and needed to ask whether she had made a mistake.  Accordingly, there is no evidence showing that Durenleau acted with knowledge of any alleged falsity in moving accounts, and she is entitled to summary judgment as a matter of law on Count IX.

In conclusion, there are no genuine disputes of material fact, and Durenleau and Badaczewski are entitled to judgment as a matter of law on the claims raised in the amended complaint.  Accordingly, because judgment will be entered in favor of Durenleau and Badaczewski, NRA's motion for summary judgment on the claims brought in the amended complaint will be denied.  The court will now consider NRA, Kusic, and Sharma's motion for summary judgment regarding the counterclaims brought by Durenleau and Badaczewski.

## B. Durenleau and Badaczewski's Counterclaims Against NRA, Kusic, and Sharma

The court now turns to NRA, Kusic, and Sharma's motion for summary judgment, arguing that there are no genuine disputes of material facts, and they are entitled as a matter of law to judgment in their favor regarding the counterclaims raised against them.  (Doc. 163.)  Durenleau and Badaczewski argue that there are genuine disputes of material fact regarding their Title VII and PHRA claims. (Doc. 173.)  The court draws all reasonable inferences in favor of non-movants,

Durenleau and Badaczewski.  Additionally, the court will address the Title VII and PHRA claims together since, "in an action under Title VII and the PHRA, the standards under the federal and state statutes are the same." *Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 491 (M.D. Pa. 2015).

Preliminarily, NRA, Kusic, and Sharma argue that Durenleau and Badaczewski lack standing to bring these claims because at various times in their respective depositions, both Durenleau and Badaczewski stated they are not seeking money from this lawsuit, which shows they have not suffered an injury entitling them to relief.  (Doc. 163, p. 83.)  As Durenleau and Badaczewski note, these statements instead demonstrate that they are not motivated solely by money in bringing these claims, but they are still seeking monetary damages.  (Doc. 142, p. 50.)  There has been no amended pleading filed and stray statements in contentious depositions will not deprive Durenleau and Badaczewski of standing. The court will now address the substance of both Durenleau and Badaczewski's claims.

### 1.  Continuing Violation Doctrine[17]

Before filing suit in federal court, a plaintiff must bring a timely charge of discrimination before the EEOC and obtain notice of her right to sue in order to exhaust her administrative remedies.  *Mandel v. M & Q Packaging Corp.*, 706 F.3d

---

[17] This argument is only applicable with respect to Durenleau's claims.

157, 163 (3d Cir. 2013).  In order for a charge to be timely, a plaintiff alleging

discrimination under Title VII in Pennsylvania must bring an EEOC charge within

300 days after the alleged unlawful employment practice.  *See* 42 U.S.C. § 2000e-

5(e)(1); *Mikula v. Allegheny Cnty. of Pa.*, 583 F.3d 181, 183 (3d Cir. 2009);

*Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000).  A plaintiff must

file a PHRA claim with the Pennsylvania Human Relations Commission within

180 days of the discriminatory act.  43 PA. STAT. § 959(h).  Here, Durenleau dual

filed her EEOC charge on April 23, 2021; therefore, the limitations period for Title

VII began on June 27, 2020, and on October 25, 2020, for the PHRA claims. (Doc.

161-23, p. 2.)

However, the continuing violation doctrine serves as an equitable exception

to the time bar under Title VII, allowing courts to consider "discriminatory acts

that are not individually actionable . . . so long as they are linked in a pattern of

actions which continues into the applicable limitations period."  *Mandel*, 706 F.3d

at 165 (citing *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)).

Therefore, a plaintiff must prove that at least one discriminatory act occurred

within the limitations period and that this alleged wrong "is more than the

occurrence of isolated or sporadic acts."  *Kimes*, 126 F. Supp. 3d at 492.  To make

this determination, courts may consider subject matter, i.e., "whether the violations

constitute the same type of discrimination," *Mandel*, 706 F.3d at 166 n.2, and

40

frequency, i.e., "whether the acts are recurring or more in the nature of isolated incidents." *Kimes*, 126 F. Supp. 3d at 492.  In considering frequency, "courts should consider the time gap between incidents and the number of incidents that have occurred in reaching their conclusion." *Oliver v. Clinical Pracs. of Univ. of Pa.*, 921 F. Supp. 2d 434, 446 (E.D. Pa. 2013).  Further, "[a]cts that are taken by two different supervisors, acting independently, over different time periods generally demonstrate isolated events rather than a persistent, ongoing pattern of discrimination." *Id.* at 445.

NRA, Kusic, and Sharma argue that many of Durenleau's allegations are outside the applicable statute of limitations and cannot be used to support her claims of sexual harassment, and the remaining allegations are insufficient to show severe and pervasive harassment as required by Title VII.  (*Id.* at 90–105.) Durenleau argues her allegations are timely under the continuing violation doctrine because they show a pattern of harassment.

Durenleau alleges the following actions show a pattern of discriminatory conduct at NRA, beginning in 2014: Kusic suggested they picture each other naked when assisting Durenleau with public speaking;  Kusic would comment about Durenleau being blond, insinuating she was stupid; HR employee Tasey Leitzell, Schaar, and Sharma joked about Durenleau sleeping with Kusic so that he would stop bothering them; Sharma made various comments regarding another

employee's weight; unnamed employees joked that Durenleau should be like a former employee who Kusic was obsessed with and allegedly bought a car for; Leitzell, Schaar, Biancha Tatum, and Kira West joked about "cleaning up the mess after;" Kusic insinuated he wanted to go skinny dipping with Durenleau; Kusic asked Durenleau "how well does your man have it at home;" Kusic swiped a cheese curl over Durenleau's lips and gave her a funny look; it was rumored in the office that a malware incident was due to Kusic watching porn in his office; Sharma discussed with Durenleau how another employee wanted to sleep with him; Sharma stated in Durenleau's presence that he wanted to sleep with another employee; after Jamie Badaczewski's employment interview, Sharma and the HR director told Durenleau that if she and Badaczewski had sex, they should film it and send it to the two men; on unspecified dates, HR employee Tasey Leitzell used to make derogatory comments regarding the collection employees; at various times throughout her employment, Durenleau and Sharma would give each other neck rubs; on an unspecified date, Sharma told Durenleau another employee had an issue with her clothes, relaying the employee said Durenleau was a "whore" and that her clothes were too tight and short; on an unspecified date, Sharma made comments about another employee's breasts; and Sharma would greet Durenleau every day with a hug or arm around the shoulder.  Finally, Durenleau argues this

pattern of sexual harassment culminated with Sharma slapping her on November 20, 2020.

Here, Durenleau has provided evidence that one act occurred during the limitations period: the November 2020 slap by Sharma.  Next, she has shown an ongoing practice of discrimination.  Although not all overtly sexual, Durenleau alleges many inappropriate sexual and sex-based comments as well as multiple instances of inappropriate touching which could be interpreted by a reasonable jury to show a pattern of sexual harassment by Kusic and Sharma.  The incidents mostly involve Durenleau's only two supervisors at NRA: Kusic and Sharma. While the events were perpetrated by two different supervisors at two distinct time periods, a reasonable jury could still connect the actions of these supervisors as one larger pattern because both men were in upper management at NRA and as such, were responsible for fostering an environment where this type of behavior was condoned.  Events that do not involve either Kusic or Sharma, such as Ms. Leitzell's general comments about the collection floor, will be excluded from consideration.  Additionally, Durenleau's gender could be a substantially motivating factor for the incidents because many of the comments dealt with her sex life.  A reasonable jury could find that Kusic and Sharma would not have treated a male employee the same way.  In total, the incidents were also fairly frequent, with a total of 15 incidents over 6.5 years and some occurring on a daily

basis.  Accordingly, the court will consider the events involving either Kusic or Sharma in analyzing whether NRA, Kusic, and Sharma are entitled to summary judgment on the hostile work environment claim.

### 2. Durenleau and Badaczewski's Hostile Work Environment Claims

### i. Durenleau's Hostile Work Environment Claim

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Sexual harassment is discrimination based on one's sex.  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S 57, 65 (1986).  Sexual misconduct, such as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature . . ." constitutes sexual harassment "whether or not it is directly linked to the grant or denial of an economic *quid pro quo*, where 'such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'"  *Id.* (quoting 29 CFR § 16041.11(a)(3)).

In order to state a claim for a hostile work environment, an employee must show "(1) the employee suffered intentional discrimination because of [her] sex, (2) the discrimination was pervasive and regular, (3) the discrimination

44

detrimentally affected the [employee], (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of *respondeat superior* liability." *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007).

First, the "[o]ffensive conduct need not necessarily include obvious sexual overtones in order to constitute unlawful harassment or discrimination." *Hargrave v. Cnty. of Atl.*, 262 F. Supp. 2d 393, 412 (D.N.J. 2003) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1485 (3d Cir. 1990)). Instead, only "a showing that [plaintiff's gender was] a substantial factor in the harassment, and that if the plaintiff had been [male] she would not have been treated in the same manner[]" is required. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996).

Next, the workplace at issue must be "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Kimes*, 126 F. Supp. 3d at 498. In determining how severe or pervasive the offensive conduct is, the court must look at the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Importantly, "[h]ostile environment claims require both an objective and a subjective showing; the environment must have been one that not only a reasonable person would find hostile and abusive, but which the actual Plaintiff in fact found to be hostile and abusive." *Pittman v. Cont'l Airlines, Inc.*, 35 F. Supp. 2d 434, 441 (E.D. Pa. 1999). "A discriminatory abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris*, 510 U.S. at 22.

Here, a reasonable jury could find that Durenleau was discriminated against on the basis of her sex. Many of the comments made were directly sexual in nature. The remaining comments were sufficiently related to her gender, such as Kusic referring to her as a blonde or Sharma's comments regarding another employee's weight, that a reasonable jury could find that they would not have been made if Durenleau was a man. Moreover, some of the comments and the slap, while not overtly sexual, were done in a "paternalistic" manner, which brings a level of intimidation that a jury could find would not be used with a man.

Accordingly, a reasonable jury could find that Durenleau was discriminated against based on her sex.

Next, a reasonable jury could find that the conduct was severe and pervasive. Durenleau has alleged and substantiated approximately fifteen incidents over a span of six and a half years. A fair portion of the conduct was in the form of mere utterances or jokes in the office, however, Durenleau does allege and provide evidence that she experienced unwanted touchings in the daily hugs by Sharma, neck rubs, and the slap across the face. There were no overt sexual overtures, but there were several sexual comments directed at her or made about others in her presence. Accordingly, there is a disputed issue of material fact as to how severe or pervasive the conduct was.

We also must consider whether the workplace was hostile and abusive from both an objective and subjective perspective. Here, Durenleau specifically testified that going to work made her uncomfortable and that she had a panic attack in 2018 due to her situation at work. (Doc. 161-8, p. 82.) She also spoke with her therapist about suffering physical and sexual abuse at work. (Doc. 155-1, p. 12.) Durenleau also references the abuse she experienced at NRA as a reason for leaving in her resignation letter, showing that the abusive environment at NRA discouraged her from remaining in employment. This is sufficient to show she subjectively viewed her workplace as hostile and abusive.

Additionally, a reasonable person in the same situation would also find the environment at NRA hostile and abusive.  The evidence of record shows an office environment where supervisors freely made inappropriate or sexually charged comments to their staff with no accountability.  A reasonable jury could find this environment hostile and abusive.

The final element of a hostile work environment claim is vicarious liability. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  When there is no employment action taken, employers may avail themselves of an affirmative defense, where they must show they "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*  This defense is "unavailable when the supervisor in question is the employer's proxy or alter ego." *O'Brien v. Middle East Forum*, 57 F.4th 110, 119 (3d Cir. 2023.)  A supervisor is an employer's "proxy" when they are "high enough in the management hierarchy that his actions 'speak' for the employer . . . he may be considered the employer's alter ego." *Id.* at 121.

NRA, Kusic, and Sharma raise a *Faragher/Ellerth* defense by arguing that Durenleau did not utilize the sexual harassment complaint system NRA had in place.  (Doc. 163, pp. 105–10.)  Durenleau argues that the *Faragher/Ellerth* defense is inapplicable in this case because the two people she is alleging sexually harassed her are proxies for NRA.  (Doc. 176, p. 98.)

Here, there was no employment action taken against Durenleau because she resigned.  It does not appear that Kusic was ever Durenleau's direct supervisor, although at all times he was the CEO.  Sharma was either her immediate supervisor or a successively higher supervisor and also the COO. (Doc. 174, ¶ 411.)  Kusic and Sharma are proxies of NRA because they are sufficiently high in the management structure that their actions could be said to speak for NRA.  Therefore, the *Faragher/Ellerth* defense is unavailable, and NRA is subject to vicarious liability.  In conclusion, there are disputed issues of material fact such that a jury must decide these questions.  NRA, Kusic, and Sharma's motion for summary judgment as to Counts I and IV of Durenleau's counterclaims will be denied.

### ii.  Badaczewski's Hostile Work Environment Claim

NRA, and Kusic only raise the *Fargher/Ellerth* defense arguing that Badaczewski did not utilize the sexual harassment complaint system NRA had in

place.  (Doc. 163, p. 131.)[18]  As noted above, the *Faragher/Ellerth* defense is not

available to employer proxies.  As Kusic was Badaczewski's direct supervisor and

CEO, a reasonable jury could find that he was a proxy of NRA.  Therefore, NRA is

subject to vicarious liability for Badaczewski's hostile work environment count,

Counts I and IV, and Kusic's motion for summary judgment on Badaczewski's

hostile work environment claim will be denied.

### 3.  Quid Pro Quo Sexual Harassment

The Third Circuit has adopted the test set out by 29 C.F.R. § 1604.11(a)(1)

and (2) for the elements of a quid pro quo sexual harassment claim, which

provides:

> Unwelcome sexual advances, requests for sexual favors, and other
> verbal or physical conduct of a sexual nature constitute sexual
> harassment when (1) submission to such conduct is made either
> explicitly or implicitly a term or condition of an individual's
> employment [or] (2) submission to or rejection of such conduct by an
> individual is used as the basis for employment decisions affecting such
> individual . . . .

29 C.F.R. § 1605.11(a)(1), (2).

An employee does not need to be threatened with or experience economic or

tangible discrimination, but the "sexual advances must be sufficiently severe as to

---

[18] The court notes that there is no evidence in the voluminous record of when Badaczewski filed her EEOC charge.  There is evidence that Badaczewski received a right to sue letter on June 29, 2021.  (Doc. 24-4, p. 2.)  However, NRA does not dispute the timeliness or even the substance of Badaczewski's hostile work environment claim.  Accordingly, that count will proceed past summary judgment.

alter the employee's 'compensation, terms, conditions or privileges of

employment,' or to 'deprive or tend to deprive [him or her] of employment

opportunities or otherwise adversely affect his [or her] status as an employee.'"

*Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296 (3d Cir. 1997) (citing 42

U.S.C. §§ 2000e-2(a)(1), (2)).  The employee must establish a causal link showing

that their "response was in fact used thereafter as a basis for a decision affecting

his or her compensation."  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 282

(3d Cir. 2000).  In considering the causal connection, the court "should not be

constrained; rather, the court can consider circumstantial evidence and draw

inferences in favor of the non-moving party in reaching this determination on

summary judgment."  *Id.* at 283.

### i.  Durenleau's Quid Pro Quo Sexual Harassment Claim

The substance of Durenleau's quid pro quo sexual harassment claim is

joking between Tasey Leitzell, Schaar, and Sharma that Durenleau should sleep

with Kusic so that he would leave them alone.  NRA, Kusic, and Sharma argue

Durenleau was not subject to quid pro quo sexual harassment because the sexual

harassment she experienced was actually a running joke in the office and no

employment benefits were attached to it.  (Doc. 163, p. 111.)  Durenleau argues

that because she did not report this incident or others, she continued to receive

promotions.  (Doc. 176, p. 41.)  However, once she reported the incident where Sharma slapped her, she was "forced out of her employment."  (*Id.*)

Here, there is no evidence showing a causal connection between the "joking" that Durenleau states as the basis for her claim and any later employment decisions.  Even though different inferences could be drawn about the fall out from Durenleau reporting Sharma's slap, that still does not provide a connection between any rejection or submission to these "jokes" and employment decisions made by NRA.  Therefore, summary judgment is granted in favor of NRA, Kusic, and Sharma on Counts II and V of Durenleau's counterclaims.

### ii.  Badaczewski's Quid Pro Quo Sexual Harassment Claim

Badaczewski's quid pro quo sexual harassment claim is based on the trip to buy candy for the office where Kusic bought her candy, inquired if other guys buy her as much stuff as he did, and then she was fired the next day.  NRA and Kusic argue Badaczewski cannot support her quid pro quo sexual harassment claims because there is no evidence showing that any sexual advances were tied to a condition of employment.  (Doc. 163, p. 135.)

Here, the evidence supporting Badaczewski's claims of Kusic making sexual advances towards her consists of statements, but Badaczewski has provided no further details regarding any specific times where these statements occurred.  (Doc. 174, ¶ 829.)  Additionally, Badaczewski points to the candy shopping incident

where she was fired the next day.  However, on that trip, there is no evidence that Badaczewski rebuffed any advance.  More specifically, there is no evidence of her response to his questions about other men buying her as many things as he does. There is also sufficient undisputed evidence to show that the decision to fire her the next day was made contemporaneously with NRA discovering that Badaczewski was the one who sent Durenleau the password spreadsheet.  (Doc. 174, pp. 300–08.)  Considering all of the evidence, Badaczewski cannot prove the causation element of her quid pro quo sexual harassment claim when there is clear evidence of a legitimate reason for her termination.  Thus, summary judgment will be entered in favor of NRA and Kusic on Counts II and V of Badaczewski's counterclaims.

### 4.  Retaliation Claims

To state a claim for retaliation under Title VII, a plaintiff must allege that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006) (citing *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir.1995)).

Protected activity ranges from formal charges of discrimination to "informal protests of discriminatory employment practices, including making complaints to

management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed charges." *Mufti v. Aarsand & Co., Inc.*, 667 F. Supp. 2d 535, 552 (W.D. Pa. 2009). To determine whether an employee has engaged in protected activity, "we look to the message . . . conveyed [by a plaintiff's conduct] rather than the means of conveyance. The complaint must allege that the opposition was to discrimination based on a protected category." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 194 (3d Cir. 2015) (citations omitted). In undertaking the protected activity, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Moore*, 461 F.3d at 341.

The retaliatory action taken against the employee must be "'materially adverse' in that [it] may well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Robinson*, 120 F.3d at 1300). Additionally, "a transfer to a less desirable position or an unsatisfactory job evaluation may constitute the requisite adverse employment action as to the terms, conditions, and privileges of employment, but modest changes in duties or working conditions and actions that simply make an employee unhappy but not producing a material disadvantage do not." *U.S. Equal Emp. Opportunity Comm'n v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 659 (W.D. Pa. 2017).

54

Finally, the causal connection element looks to the reason for the harassment, and "identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus." *Id.* (quoting *Jensen v. Potter*, 435 F.3d 44, 449 n.2 (3d Cir. 2006) (*overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53 (2006)). Temporal proximity can be used to show a causal connection if it is unusually suggestive. *Daniels*, 776 F.3d at 196. Absent unusually suggestive temporal proximity, "we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Id.*

### i. Durenleau's Retaliation Claim

Durenleau's retaliation claim includes three types of retaliatory acts. First, Durenleau alleges she was retaliated against while still working at NRA by having her parking space taken away, no longer being permitted to arrive to work early, being the only manager without a laptop, being removed from the e-team, being the subject of false fraud allegations, being forced to work while on COVID leave, and eventually having a baseless corrective action report which threatened termination on the next infraction. (Doc. 142, pp. 41–45.) Second, Durenleau alleges she was constructively discharged in retaliation for her report. (*Id.*) Third,

Durenleau alleges she was retaliated against after her employment ended by the filing of the instant lawsuit and NRA threatening discrimination charges.  (*Id.*)  On the other hand, NRA argues that Durenleau was not retaliated against because her report of the slap incident was not a protected activity, many of the instances of retaliation she recounts had legitimate reasons, she voluntarily resigned, and her attorney's demand letter was not a protected activity.  (*Id.* at 114–30.)  The court will address each type of retaliatory conduct in turn.

Turning to the conduct while Durenleau was still employed at NRA, Durenleau's emailed statement to in house counsel regarding the slap incident is protected activity because it is a complaint to management regarding Sharma's actions which could be considered sexual harassment.  Durenleau does not call the incident "sexual harassment," but it is clear that she believed the slap was inappropriate and needed to be reported.  Further, Durenleau made this statement in good faith and believed the slap was unlawful under Title VII because in the email she stated, "I want this on file just in case I lose my job, get demoted or have my pay reduced[,]" and she immediately reported the incident.  (Doc. 162-1, p. 6.)  Durenleau's actions after the slap show that she knew this incident was something out of the ordinary and that she needed to get NRA's legal counsel involved.  Drawing all reasonable inferences in favor of Durenleau, a reasonable jury could

find that she was reporting an act of sexual harassment, making this email a protected activity.

Next, having her parking space taken away, not being allowed to go to work early, and being denied a work laptop, taken in totality with Daube's comment that "once you stiff him [Sharma], you're done" and the corrective action report for the allegedly fraudulent transfer of accounts wherein she was warned that her next violation would result in termination of her employment, is an adverse employment action which would dissuade a reasonable employee from filing a formal charge of discrimination.  These actions, which marked a change in how she had operated at NRA, all occurred after she reported the November 2020 slap. Drawing all reasonable inferences in favor of Durenleau, a reasonable jury could find that these changes collectively rise to the level of a materially adverse employment action.

NRA provides non-discriminatory reasons for these decisions, but Durenleau alleges that these reasons are merely pretext because of the comment "once you stiff [Sharma], you're done."  Further, Durenleau points to past employees who complained about the working environment of NRA and were also threatened with a lawsuit.  This is sufficient to create a disputed issue of material fact regarding whether Durenleau suffered an adverse employment action.

Finally, turning to causation, Durenleau argues that all of the more minor retaliatory actions, as well as the corrective action report, coupled with Daube's comments show retaliatory animus.  Daube knew that Durenleau had made a complaint about Sharma slapping her because she sat in on the investigation into the incident.  (Doc. 161-16, p. 27.)  After this investigation, there was a change in how NRA treated Durenleau.  Some implicit facets of her employment situation, such as parking near the front and arriving at work early, were taken away.  There was a corrective action report that was issued approximately two months after Durenleau reported the slap, the subject of which was allegedly fraudulent account transfers that Durenleau did not realize were against the rules.  The timing of these changes is sufficient to create a dispute of material fact regarding whether they were taken with retaliatory animus.  Therefore, NRA, Kusic, and Sharma's motion for summary judgment will be denied regarding Durenleau's retaliation claim while she was still employed at NRA.

Turning to Durenleau's constructive discharge claim, an employee must establish "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Aman*, 85 F.3d at 1084.  In making this determination, the court employs an "objective standard, requiring no more than a finding that the conduct complained of would have the foreseeable result that working conditions would be so

unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Goss v. Exxon Off. Sys. Co.*, 747 F.2d 885, 887–88 (3d Cir. 1984).  The court must consider, "whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010).  Further, "[a] hostile work environment 'will not always support a finding of constructive discharge.'" *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006) (quoting *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 28 (1st Cir. 2002)).  There must be a greater showing of severity or pervasiveness than in a hostile work environment claim.  *Id.*

Here, Durenleau was threatened with discharge through the corrective action report that provided her next violation would result in termination.  Durenleau has also provided sufficient facts to create a dispute regarding whether she suffered a hostile work environment, as previously discussed.  Additionally, as discussed above, she also showed a crackdown on her behavior after reporting the slap incident with Sharma.  Similar to *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996), Durenleau has established that she faced a pattern of discrimination for several years and then faced an uptick in negative consequences after she reported the clap incident.  A reasonable employee could feel compelled

to quit when confronting these circumstances.  Accordingly, NRA, Sharma, and Kusic's motion for summary judgment on Durenleau's constructive discharge retaliation claim is denied.

Finally, turning to Durenleau's retaliation claims post-resignation, "a plaintiff must show that [s]he engaged in protected activity, that [her] former employer had influence over a subsequent employment-related decision, and that [her] former employer made a retaliatory use of that influence to the detriment of the plaintiff's employment opportunities." *Boandl v. Geithner*, 752 F. Supp. 2d 540, 567 (E.D. Pa. 2010) (citing *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200–201 (3d Cir. 1994)).

NRA argues that her criminal complaint and her attorney's notice of claims was not a protected activity because it did not refer to the slap incident as "sexual harassment." (Doc. 163, p. 126–27.)  However, as we held above regarding Durenleau's email, the notice references the slap incident, which could be sexual harassment, as it is unlikely that Sharma would slap a male employee.  Next, Durenleau provides evidence that Kusic emailed her supervisor at her new job, pointing them towards evidence in this case showing that Durenleau had her boyfriend, a police officer, check for information on this individual.  (Doc. 173-2, p. 2.)  This email was sent the day after she was terminated by her subsequent employer.  (Doc. 161-8, p. 19.)  There is no other evidence in the record regarding

why she was terminated from her subsequent position besides Durenleau's speculation that someone contacted her new employer prior to her termination. Durenleau's speculation is not sufficient to establish a causal connection. Therefore, summary judgment is granted in favor of NRA, Kusic, and Sharma on Durenleau's post-resignation retaliation claim.

In conclusion, NRA, Kusic, and Sharma's motion for summary judgment is granted regarding Durenleau's post-resignation retaliation claim but denied regarding Durenleau's retaliation claim while at NRA and her constructive discharge claim.

### ii. Badaczewski's Retaliation Claim

NRA argues that Badaczewski can provide no evidence of a causal connection for her retaliation claim where she was terminated for legitimate business reasons. (Doc. 163, p. 137.) Badaczewski argues that her termination occurred after Badaczewski made a report to HR regarding Kusic's intimidating conduct with her. (Doc. 173, p. 53.)

Here, Badaczewski's email to HR consisted of complaints that Kusic made "rude condescending comments towards me about my intelligence, work ethic, and ability to grasp something." (Doc. 161-13, p. 24.) This email is entirely regarding her ability to perform her job and makes no reference to any comments that could be related to her sex in anyway. However, in a subsequent meeting with HR

regarding the email, she told the HR director and Lisa Daube about Kusic

"constantly talk[ing] about me being blond and having big boobs." (Doc. 174,

¶ 866.)  These complaints are sufficiently relating to her sex that reporting them in

the meeting consists of a protected activity.  However, the act of terminating her is

not sufficiently causally connected to these reports to constitute retaliatory animus.

Initially, she sent the email and had the meeting in January and she was not

terminated until March.  Further, her termination is temporally very close to NRA

discovering that she had been the one who logged into Durenleau's computer and

sent her the spreadsheet.  Therefore, Badaczewski cannot prove she was retaliated

against for her complaints to HR about Kusic's potential sexual harassment.

Summary judgment will be granted in favor of NRA and Kusic on Counts III and

VI of Badaczewski's counterclaims.

### 5.  PHRA Claims against Kusic and Sharma Individually

#### i.  Durenleau's Individual Claims

Kusic and Sharma argue that Durenleau's individual claims against them fail

because they are untimely, and she fails to show a PHRA violation.  (Doc. 163,

p. 130.)  First, Durenleau's claims are timely because the continuing violation

doctrine applies to PHRA claims as well as Title VII claims.  *Lesko v. Clark

Publisher Svcs.*, 904 F. Supp. 415, 419 (M.D. Pa. 1995).  Here, Durenleau filed her

EEOC and PHRA charge within 180 days after the November 20, 2020, slap.

(Doc. 161-23.)  Since the court held that the continuing violation doctrine applies to the Title VII claim, it applies to the individual PHRA claims for the same reasons.

Second, the PHRA establishes liability for employers for unlawful employment practices, but also provides that it is unlawful for "any person, employer, employment agency, labor organization or employe[e], to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice . . . ."  43 PA. STAT. § 955(a), (e).  Further, "in the appropriate factual scenario, an individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory . . . for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision."  *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998) (citing *Dici v. Commonwealth of Pa.*, 91 F.3d 542, 552 (3d Cir. 1996)).  The appropriate circumstances to find a supervisor liable for his own discrimination is when they "engage[] in discriminatory conduct while acting in the scope of his employment" because they "share[] the intent and purpose of the employer and may [properly] be held liable for aiding and abetting the employer in its unlawful conduct."  *Glickstein v. Neshaminy Sch. Dist.*, No. 96–6236, 1997 WL 660636, at *12 (E.D. Pa. Oct. 22, 1997).

63

Here, the aiding and abetting count against Sharma can proceed because Sharma was Durenleau's supervisor at the time of the alleged harassment and the harassment occurred while at work, in the scope of their supervisor-direct report relationship.  Further, the individual liability claim can go forward against Kusic because he is the CEO of NRA and can be said to "share the intent and purpose" of the employer.  Accordingly, NRA, Kusic, and Sharma's motion for summary judgment will be denied as to Count IV of Durenleau's counterclaims.

### ii.  Badaczewski's individual claims

Kusic argues Badaczewski's individual claims against Kusic fail because she fails to show a PHRA violation.  (*Id.* at 144.)  For the same reasons that Durenleau's claims against her supervisor will go forward, so will Badaczewski's.  Kusic's motion for summary judgment will be denied as to Count IV of Badaczewski's counterclaims.

### CONCLUSION

Durenleau and Badaczewski's motion for summary judgment regarding NRA's claims against them is granted.  NRA, Kusic, and Sharma's motion for summary judgment on Durenleau and Badaczewski's counterclaims will be granted in part and denied in part.  An order follows.

s/Jennifer P. Wilson<br>
JENNIFER P. WILSON<br>
United States District Judge<br>
Middle District of Pennsylvania

Dated: December 19, 2023